UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MANUEL RAUL REYES-PENA, | : | CIVIL ACTION NO. 3:CV-16-0042 |
| Petitioner | : | (Judge Nealon) |
| v. | : | |
| DEPARTMENT OF HOMELAND SECURITY, | : | |
| Respondent | : | |

## MEMORANDUM

Petitioner, a detainee of the Immigration and Customs Enforcement ("ICE"), currently confined in the Canaan United States Penitentiary, Waymart ("USP-Canaan"), Pennsylvania, filed the above captioned petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Doc. 1, petition). He seeks an immediate Order of removal to Cuba. Id. A response to the petition was filed on February 22, 2016. (Doc. 14). No traverse has been filed. The petition is ripe for disposition. For the reasons set forth below, the petition will be denied.

I. **Background**

Petitioner, a native and citizen of Cuba, entered the United States on May 1, 1980, on the private vessel "Maria Mercedes" and was paroled into the United States. (Doc. 14-10 at 2, Record of Reportable/Inadmissible Alien at 2-3).

On August 22, 1980, Petitioner was arrested in Dade County, Florida, for Carrying a Concealed Weapon in violation of Florida Statute § 790.01, and was convicted and sentenced to a six day term of incarceration. (Doc. 14-6 at 2-3, Complaint/Arrest Affidavit).

On September 22, 1980, Petitioner was arrested while living in Tent City in Dade County, Florida, on an outstanding warrant for Kidnapping, Sexual Battery, and Grand Larceny. (Doc. 14-7 at 2-7, Complaint/Arrest Affidavit). On June 1, 1984, Petitioner was convicted of Sexual Battery with a Deadly weapon, to wit: a Machine Gun in violation of Florida Statute § 794.011(3), Kidnapping in violation of Florida Statute § 787.01, and Grand Theft in the Second Degree in violation of Florida Statute § 812.014. (Doc. 14-7 at 8-9, Judgment). He was sentenced to twelve years of incarceration with three years and 247 days credit for time incarcerated before sentencing. (Doc. 14-7 at 11-14, Sentence).

On July 9, 1990, Petitioner was charged with Aggravated Assault with a Weapon while in the Florida Department of Corrections. (Doc. 13-7 at 2, Mental Health Evaluation (SEALED)).

On October 16, 1992, after Petitioner was released from criminal custody by the State of Florida, he was arrested for Aggravated Assault in violation of

2

Florida Statute § 784.021 for an alleged fist fight followed by chasing the victim's wife with a large stick and threatening to kill both persons. (Doc. 14-8 at 2-3, Complaint/Arrest Affidavit). The charge was not prosecuted for insufficient evidence. (Doc. 14-8 at 6, Jail Release).

On September 9, 1993, Petitioner was arrested for Aggravated Battery of a Police Officer. (Doc. 13-7 at 2, Mental Health Evaluation (SEALED)). He pleaded *nolo contendre* and adjudication was withheld. Id. Ex. 22 at 1.

On October 12, 1993, Petitioner was transferred from criminal custody to immigration custody. (Doc. 1, Petition at 2).

On January 4, 1994, Immigration and Naturalization Service ("INS") revoked Petitioner's parole, (Doc. 14-9 at 2, Revocation Letter), and issued Petitioner a Notice To Appear in exclusion proceedings. (Doc. 14-10 at 2-5, Notice to Appear). The INS charged Petitioner with exclusion under 8 U.S.C. §1182(a)(2)(A)(i)(I) for committing a crime involving moral turpitude, 8 U.S.C. § 1182(a)(2)(B) for multiple criminal convictions, and 8 U.S.C. § 1182(a)(7)(A)(i)(I) for attempting to enter the United States without valid documents. Id.

3

On February 3, 1994, Petitioner was ordered excluded[1] from the United States as charged. (Doc. 14-11 at 2, Exclusion Order).

On May 17, 1994, the INS reviewed Petitioner's custody under the regulations promulgated for the detention of Mariel Cubans with final removal orders under 8 C.F.R. §212.12. (Doc. 14-12 at 2-4, Final Notice of Parole Denial). The Panel determined that Petitioner's parole would not be reinstated and he would not be released from immigration detention because it was "NOT clearly evident that you are unlikely to remain non-violent and/or unlikely to violate the conditions of parole were a more favorable decision to have been rendered on [Petitioner's] behalf." Id. (emphasis in original). ICE has reviewed Petitioner's custody status periodically for the duration of his detention in accordance with the regulations.

On October 19, 2005, the Chicago Immigration Court held a hearing under 8 C.F.R. § 241.14(h) to determine whether ICE showed reasonable cause to hold a

---

[1] In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which changed much of the terminology used in the classification of aliens under the Immigration and Nationality Act. See Pub. L. No. 104-208, § 304, 110 Stat. 3009 (1996). Before IIRIRA, aliens ineligible for admission to the United States were classified as "excludable," while those who gained admission were referred to as "deportable." "Excludable" aliens, such as Petitioner, are now referred to as "inadmissible," and the former "exclusion proceedings" and "deportation proceedings" are both now known as "removal proceedings." See Clark v. Martinez, 543 U.S. 371, 376 n.3 (2005).

4

hearing on Petitioner's detention, and determined the agency had done so. (Doc. 14-4 at 2, Order of the Immigration Judge).

On November 8, 2005, the Chicago Immigration Court held a hearing under 8 C.F.R. § 241.14(i) and determined that ICE established that Petitioner is a special danger to the public and should remain in custody. (Doc. 14-15 at 3, Order of the Immigration Judge). Although Petitioner was advised that he may appeal the decision to the Board of Immigration Appeals by December 8, 2005, id., the record indicates that Petitioner did not appeal the Immigration Court's decision to the Board.

ICE regularly reviewed Petitioner's detention after the Immigration Judge's November 8, 2005 decision. (Doc. 13-1 at 2-4, 2006 Decision to Continue Detention (SEALED); Doc. 13-2 at 2-4, 2007 Decision to Continue Detention (SEALED); Doc. 13-3 at 2, 2009 Decision to Continue Detention (SEALED); Doc. 13-4 at 2-4, 2011 Decision to Continue Detention (SEALED); Doc. 13-5 at 2-4, 2012 Decision to Continue Detention (SEALED); Doc. 13-6 at 2-4, 2013 Decision to Continue Detention (SEALED)).

On March 4, 2009, and June 7, 2012, in a good faith effort to remove Cuban

Nationals with final orders of removal[2], ICE requested travel documents on behalf of Petitioner from the Cuban Interest Section in Washington, D.C. (Doc. 14-3 at 2, Letter to Cuban Interest Section; Doc. 14-4 at 1 (same)).  On February 11, 2015, ICE contracted for a private mental health evaluation of Petitioner. (Doc. 13-7 at 2-16, Mental Health Evaluation (SEALED)). A psychologist reviewed numerous records evidencing Petitioner's criminal, medical, disciplinary, and psychiatric history. Id. The psychologist diagnosed Petitioner with Schizoaffective Disorder, Bipolar type. Id. The psychologist determined that, based on Petitioner's "mental condition [and/or] personality disorder and behaviors associated with that condition or disorder, he is likely to engage in acts of violence in the future and there are no conditions of release that can reasonably be expected to ensure the safety of the public." Id.

On Feb. 27, 2015, based on the psychologist's evaluation and Petitioner's criminal history, ICE determined that Petitioner should remain in ICE custody.

---

[2]The Government of Cuba only allows for the return of Cuban nationals under a 1984 repatriation agreement where Cuba agreed to accept the return of 2,746 named Cuban nationals who, in most circumstances, migrated to the United States in 1980 via the Port of Mariel. (Doc. 14-2 at 2-4, Affidavit of John A. Schultz, ICE Unit Chief, at ¶ 6). Petitioner is not listed on the 1984 repatriation agreement. Id. at ¶ 7. Thus, Petitioner cannot be repatriated to Cuba. Id.

(Doc. 13-8 at 2-4, 2015 Decision to Continue Detention (SEALED)). Petitioner is detained at the USP-Canaan pending removal from the United States.

On July 20, 2015, diplomatic relations between the United States and Cuba were formally reinstated, when the two countries reopened their respective embassies. (Doc. 14-2 at 2-4, Affidavit of John A. Schultz, ICE Unit Chief, at ¶ 9). During subsequent U.S.-Cuba Migration Talks in November 2015, the Government of Cuba insisted on the negotiation of a new U.S.-Cuba Migration Accord before facilitating the return of its nationals. Id. at ¶ 10. The U.S. and Cuba have not negotiated a new Migration Accord, and the Cuban government maintains its refusal to repatriate any of its nationals who are not part of the Migration Accord of 1984. Id. at ¶ 11.

On January 8, 2016, Petitioner filed the instant petition for writ of habeas corpus, in which he challenges his continued detention. (Doc. 1, petition). Specifically, Petitioner seeks removal to Cuba, stating that "the Cuban Embassy in Wash DC is open for business after 50 years" and "daily departures are available from the Miami, Florida, International Airport to Havana, Cuba, and I have Govt Approval." Id. Petitioner cites to marazul.com, a website for a company that allegedly provides charter flights from Miami, Florida, to Cuba, as well as provides

7

a letter from Red Cross of Cuba to the American Red Cross; neither of which provide any indication that either organization can effect his removal. Id. Thus, he seeks an "immediate order" for the enforcement of the exclusion order issued in 1994 along with the payment of travel expenses. Id.

## II. Discussion

Title 8 U.S.C. § 1231(a) gives the Attorney General ninety (90) days to remove an alien from the United States after an order of removal. During this ninety (90) day period, detention is mandatory. 8 U.S.C. § 1231(a). At the end of the ninety (90) day period, ICE may continue to hold the alien, or it may grant supervised release. 8 U.S.C. §§1231(a)(3) & (6). The discretion to detain an alien under § 1231(a) is limited by the Fifth Amendment's Due Process clause. See Zadvydas v. Davis, 533 U.S. 678, 693-94 (2001).

> As the Supreme Court explained in Zadvydas:
>
> When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90–day statutory "removal period," during which time the alien normally is held in custody.
>
> A special statute authorizes further detention if the Government fails to remove the alien during those 90 days. It says:

> "An alien ordered removed [1] who is inadmissible ... [2][or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision...." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

As the Zadvydas Court observed, the relevant statute distinguishes three categories of aliens. In that case, the Court considered whether the "post-removal-period statute authorizes the Attorney General to detain a removable alien [i.e., the second category of alien who was lawfully admitted, but subsequently violated a condition of admission] **indefinitely** beyond the removal period or only for a period **reasonably necessary** to secure the alien's removal." Zadvydas, 533 U.S. at 682 (emphasis in original). Employing the doctrine of constitutional avoidance, the Court held that the statute implicitly authorizes continued detention for a presumptively reasonable six-month period. Id. at 701. In Clark v. Martinez, 543 U.S. 371, 378 (2005), a case considering the post-removal order detention of two Mariel Cubans, the Court applied its holding in Zadvydas to all three categories of aliens in § 1231(a)(6):

> The operative language of § 1231(a)(6), "may be detained beyond the removal period," applies without differentiation to all three categories of aliens that are its subject. To give these same words a different meaning for each category would be to invent a statute

rather than interpret one. As the Court in Zadvydas recognized, the statute can be construed "literally" to authorize indefinite detention, id., at 689, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, or (as the Court ultimately held) it can be read to "suggest [less than] unlimited discretion" to detain, id., at 697, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653. It cannot, however, be interpreted to do both at the same time.

In the wake of Zadvydas, but prior to Clark, the Attorney General promulgated a set of regulations designed to narrow the scope of his authority to detain aliens beyond the post-removal order period in order to comply with the Supreme Court's decision. See 8 C.F.R. §§241.13, 241.14. These regulations provide for the release of the vast majority of aliens where there is no likelihood of removal, but carved out an exception applying to a narrow subset that the Attorney General has "determined to be specially dangerous." 8 C.F.R. § 241.14(f). Section 241.14(f)(1) provides:

> Subject to the review procedures provided in this section, the Service shall continue to detain an alien if the release of the alien would pose a special danger to the public, because:
>
> (i) The alien has previously committed one or more serious crimes of violence as defined in 18 U.S.C. 16;
>
> (ii) Due to a mental condition or personality disorder and behavior associated with that condition or disorder, the alien is likely to engage in acts of violence in the future; and
>
> (iii) No condition of release can reasonably be expected to ensure the safety of the public.

Here, Respondent argues that Petitioner's continued detention is authorized

pursuant to 8 U.S.C. §241.14(f), and that this regulation is a reasonable and permissible post-decision interpretation of 8 U.S.C. § 1231(a)(6), which allows for continued detention for aliens who are a risk to the community. See Hernandez-Carrera v. Carlson, 547 F.3d 1237, 1248-49 (10th Cir. 2008) (citing Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs. ("Brand X"), 545 U.S. 967, 982 (2005)); Marquez–Coromina v. Hollingsworth, 692 F.Supp.2d 565, 568–69 (D. Md. 2010) (holding that agency's regulation carving out exception to release of aliens unlikely to be removed if they were especially dangerous was reasonable interpretation of statute authorizing alien's detention beyond ninety days, and was entitled to deference, and the regulation supported detention). The Court agrees.

As Respondent aptly states, and the Court agrees, if the Government could remove Petitioner to his native Cuba, it would. Unfortunately, the Cuban Government only allows for the return of Cuban nationals under a 1984 repatriation agreement. See In re Cuban, 822 F. supp. 192, 194 (M.D. Pa. 1993). An agreement that did not include Petitioner's name.

Although Petitioner is correct that diplomatic relations between the United States and Cuba have been reinstated, there has yet to be an established process whereby ICE can remove and repatriate Cuban nationals with final orders of

11

removal. Thus, until a new Migration Accord is negotiated, Petitioner is not removable.

In the interim, Petitioner has been afforded due process in accordance with 8 C.F.R. §241.14 and his detention remains lawful under 8 U.S.C. §1231(a)(6). Petitioner is subject to a final order of removal as a result of his criminal conduct. His parole was revoked and detention initially reviewed under 8 C.F.R. §212.12[3] as an inadmissible Mariel Cuban subject to a final exclusion order. Notably, a three-judge panel of this court upheld the continued detention of inadmissible aliens under 8 C.F.R. § 212.12. See In re Cuban, supra.

Petitioner's detention was then reviewed under 8 C.F.R. §241.14(f) after the new regulation was promulgated in 2001 in response to Zadvydas. ICE determined that, based on the unlikelihood of his removal, the forensic psychiatric evaluation, a review of his criminal and disciplinary history, as well as the likelihood of Petitioner engaging in future acts of violence, that Petitioner would pose a special danger to the public if released. ICE advised Petitioner of the

---

[3] In Clark v. Martinez, 543 U.S. 371 (2005), the Supreme Court essentially rendered 8 C.F.R. §212.12 a regulatory dead letter when it found that its prior holding in Zadvydas v. Davis, that Immigration and Nationality Act (INA) limits time that government may detain aliens who have been found removable to that reasonably necessary to effect removal, also applies to aliens deemed inadmissible to United States.

upcoming review of the decision by an Immigration Court and Petitioner's rights at the hearing.

ICE then referred the decision to the Chicago Immigration Court in accordance with 8 C.F.R. §241.14(g). An immigration court determined there was probable cause to conduct a merits hearing on Petitioner's detention under 8 C.F.R. §241.14(h). After holding a hearing where Petitioner was able to present evidence, the Immigration Court found that ICE established that Petitioner is a special danger to the public and should remain in custody. Since the Immigration Court decision, ICE has provided regular reviews of Petitioner's detention under 8 C.F.R. §241.14(i)(7), most recently on February 27, 2015. Based Petitioner's criminal history, the February 11, 2015 psychologist review of Petitioner's record, and psychological examination of Petitioner, it was determined at his February 27, 2015 hearing that Petitioner should remain in ICE custody.

Should conditions between the Cuba and the United States change, Petitioner is free to file for administrative review of his detention, which, pursuant to 8 C.F.R. §241.14(k)(3), he may request as frequently as every six months.[4] Until

---

[4]Although Petitioner has not requested review under 8 C.F.R. §241.14(k), once an alien makes a written request to ICE, the agency will conduct a review of the alien's detention based on changed circumstances. 8 C.F.R. §241.14(k)(2). The alien has the burden of proving a material change in circumstances evidencing that his release would not pose a special danger to the public. 8 C.F.R. §241.14(k)(5). If ICE

such time, Petitioner's continued detention remains lawful under 8 U.S.C. §1231(a)(6) and 8 C.F.R. §241.14(f).

III. **Conclusion**

In light of the foregoing, the petition for writ of habeas corpus will be **DENIED**, and the case will be **CLOSED**. An appropriate order will follow.

/s/ William J. Nealon
**United States District Judge**

Dated: April 13, 2016

---

determines that the alien has demonstrated changed circumstances that warrant his release, ICE will release the alien under appropriate conditions of release. If ICE denies the alien's request for release under alleged changed circumstances, the alien may seek a review of that determination before the immigration court that made the initial detention determination. 8 C.F.R. §241.14(k)(6). If the immigration judge determines that the alien provided good reason to believe, because of a material change of circumstances, that releasing the alien would not pose a danger to the public, the immigration judge may set aside his original determination and schedule a new merits hearing under 8 C.F.R. §241.14(i). 8 C.F.R. §241.14(k)(6)(ii). At the hearing, ICE again would bear the burden of establishing that the alien should be detained, 8 C.F.R. §241.14(i), and the alien again would have the opportunity to appeal an adverse decision, 8 C.F.R. §241.14(k)(6)(iii).